In The Matter of The PATERNITY OF T.P.,

M. and M.L., Appellants–Intervenors,

v.

B.C., Appellee–Petitioner,

and

M.P., Respondent.

No. 49A02–0907–JV–685.

Court of Appeals of Indiana.

Jan. 29, 2010.

Transfer Denied April 15, 2010.

Bryan Lee Ciyou, Ciyou & Dixon, P.C., Indianapolis, IN, for Appellee.

Kevin C. Tyra, Jerry M. Padgett, Ozanam Free Legal Clinic c/o Tyra Law Firm, P.C., Indianapolis, IN, for Appellant.

## OPINION

BRADFORD, Judge.

In this paternity action brought by B.C. ("Mother") against M.P. ("Father"), Appellants–Intervenors M. and M.L. ("Caretakers") challenge the trial court's denial of their petition for temporary and permanent modification of custody of T.P. Upon appeal, Caretakers challenge the trial court's conclusion that they did not qualify as de facto custodians and its denial of their petition seeking joint legal custody and permanent physical custody of T.P. We affirm.

### FACTS AND PROCEDURAL HISTORY

T.P. was born to Mother and Father on September 1, 2001. When T.P. was an infant, Mother and Father worked for Caretakers' restaurant. On June 17, 2004, Mother and Father asked Caretakers to care for T.P. temporarily until Mother, who was homeless, could better provide for T.P. Caretakers agreed to care for T.P. On August 9, 2004, Mother reported T.P. missing to authorities. Authorities found

T.P. at the Caretakers' home. Caretakers showed authorities a notarized statement indicating Mother's and Father's consent that they care for T.P.

On August 10, 2004, the Marion County Office of Family and Children ("MCOFC")[1] initiated Child in Need of Services ("CHINS") proceedings. On August 11, 2004, the trial court concluded that T.P. was a CHINS and ordered that she be placed with Caretakers. Mother and Father were granted supervised visitation. The permanency plan for T.P. was reunification with her parents. On October 25, 2004, Mother filed a paternity action against Father. On November 8, 2004, the trial court established Father's paternity, granted him visitation, and ordered him to pay child support.

At some point, Caretakers went on vacation and left T.P. with someone who was not a certified foster care worker, causing authorities to remove T.P. from their care. At a January 2005 review hearing, the trial court noted that Mother was participating in services and "doing excellent." Appellant's App. p. 121. At an August 17, 2005 hearing, the court again noted that Mother was doing well and that she and T.P. had a strong bond. On October 26, 2005, MCOFC requested closure of the CHINS proceedings, and T.P. was placed in Mother's care.[2]

Caretakers continued to have a role in T.P.'s life and cared for her "many days out of the month," with Mother's permission. Beginning in the summer of 2007, according to the Caretakers, Mother moved multiple times and lacked proper housing. Caretakers provided Mother and T.P. with food and money. In July 2008, Caretakers wondered from Mother's appearance whether she was using drugs. During this time T.P. was sometimes "filthy," so Caretakers frequently cared for her. Tr. Vol. 1, p. 29.

During the period from May 2007 to September 10, 2008, Caretakers cared for T.P. for a total of 244 days. Mother admitted to having used drugs, including crack, in the summer of 2008. On August 24, 2008, Mother and her brother were involved in a physical altercation and arrested.

T.P. has difficulties with school. There are conflicting accounts regarding whether T.P. has been diagnosed with behavioral or learning problems.[3] T.P.'s frequent moves with Mother have caused her to change schools multiple times. T.P. struggled in kindergarten and missed more than ten percent of her school days. T.P. was promoted to the first grade, which she began in August of 2008. Because T.P. moved just prior to her first-grade year, she missed the first weeks of school. T.P. continued to have difficulties, and school authorities determined that she should repeat the first grade in 2009–10.

Mother is aware of T.P.'s difficulties, did not object to T.P.'s repeating the first grade, and requested testing to evaluate T.P.[4] Apparently, however, school officials deemed T.P. too young to test for learning disabilities. As of the April 21, 2009 hear-

1. MCOFC is currently known as Marion County Department of Child Services.

2. In support of their petition for custody, Caretakers reference certain domestic disturbances, one involving a pit bull terrier, between Mother and her boyfriend, D.B., allegedly in the presence of T.P. Notably, these altercations occurred prior to the successful conclusion of the CHINS proceedings, after which Mother regained custody of T.P.

3. Mother testified that T.P. had been diagnosed with ADHD. Guardian ad Litem Elizabeth Polleys testified that one of T.P.'s teachers believed T.P. did not have ADHD.

4. Mother has an eighth-grade education.

ing, T.P. was receiving tutoring three days a week during the school day. Mother requested that T.P. see a behavioral counselor, whom T.P. began seeing once a week.

On September 10, 2008, Caretakers filed an emergency petition to intervene in Mother's paternity action against Father, in which they sought temporary and permanent modification of custody of T.P. on the grounds that there had been a substantial change in circumstances. According to Caretakers, they were T.P.'s de facto custodians in terms of her financial and physical needs since June 17, 2004; that Mother had been in and out of jail, jeopardizing T.P.'s mental and physical well-being; that Mother continued to use illegal drugs and exposed T.P. to sex and multiple persons in her home; and that Mother's transience and poor housing conditions, as well as her unemployment, rendered her incapable of supporting T.P. without their assistance.

The trial court held hearings on the petition on February 12, 2009 and April 21, 2009. At the hearings, Domestic Relations Counseling Bureau ("DRCB") social worker Robin Leffler–Pannell recommended that Caretakers and Mother share joint custody of T.P. with Caretakers having primary physical custody. Leffler–Pannell did not dispute that this recommendation was based partly upon Mother's inadequate housing, and that this housing had since improved. By the time of the hearing, Mother's housing had adequate electricity, running water, and standard appliances such as a refrigerator and stove. Leffler–Pannell additionally agreed that Mother had made improved efforts regarding T.P.'s education, and further, that a medical examination of T.P. had revealed no "red flags" suggesting T.P. suffered from medical problems. In addition, Mother admitted drug use in the summer of 2008 but denied having taken drugs for months prior to February 2009. Mother and her live-in boyfriend, D.B., tested negative for drugs in November 2008. As of the April 21, 2009 hearing, Mother denied any additional drug use.

Guardian ad Litem Elizabeth Polleys similarly recommended that Caretakers have physical custody of T.P. during the week, with Mother having custody one day per week and every other weekend.[5] Polleys based this recommendation largely upon T.P.'s educational difficulties, which she believed Caretakers were better able to address. According to Polleys, Caretakers have investigated the possibilities for T.P. to receive additional tutoring, including summer tutoring. In addition, Polleys was concerned about the safety of Mother's neighborhood. Mother's boyfriend D.B. was apparently stabbed approximately three blocks from Mother's home. Polleys indicated, however, that Mother had begun escorting T.P. to and from school every day to ensure her safety.

Caretakers believed that Mother stopped permitting them to spend time with T.P. after they filed the instant petition. Mother claimed she was not opposed to T.P.'s continuing to spend time with Caretakers.

As of the April 21, 2009 hearing, Mother was unemployed after having been briefly employed at a nearby store and in a temporary job.[6] Mother relied upon D.B.,

5. Polleys is a volunteer Guardian ad Litem and does not have specific training in the area of social work.

6. The parties dispute the propriety of this court's considering certain employment evidence referenced by Mother in her Appellee's Brief which was allegedly not part of the lower court's record. We conclude that con-

who received unemployment and worked for a temporary employment agency, to pay her rent.

Following the hearings, on July 24, 2009, the trial court denied Caretakers' petition seeking modification of custody. In doing so, the trial court entered findings and conclusions, among them that Caretakers were not de facto custodians. The trial court further acknowledged the recommendations by Leffler–Pannell and Polleys that T.P.'s custody be modified in favor of Caretakers, but it determined that these recommendations were made without regard for the presumption in favor of the natural parent. In denying Caretakers' petition, the trial court nevertheless awarded them visitation with T.P., permitting them one overnight visit per month. This appeal follows.

## DISCUSSION AND DECISION

Upon appeal, Caretakers claim that the trial court erred in concluding that they were not de facto custodians and in denying their petition for modification. Mother responds by first arguing that any error in the trial court's determination of their de facto custodian status is harmless, given the natural parent presumption. On the merit s, Mother argues that the trial court did not commit clear error in concluding that Caretakers failed to overcome the presumption that she, as biological parent, should maintain custody of T.P.

### I. Standard of Review[7]

We review custody modifications for abuse of discretion with a " 'preference for granting latitude and deference to our trial judges in family law matters.' " *In re Paternity of K.I.,* 903 N.E.2d 453, 457 (Ind.2009) (quoting *Kirk v. Kirk,* 770 N.E.2d 304, 307 (Ind.2002) (internal quotation omitted)). Also, as with all cases tried by the court without a jury, the trial judge in this case entered special findings and conclusions thereon pursuant to Indiana Trial Rule 52(A). *Id.* In reviewing findings made pursuant to Rule 52, we first determine whether the evidence supports the findings and then whether findings support the judgment. *Id.* On appeal we " 'shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.' " *Id.* (quoting Ind. Trial Rule 52(A)). A judgment is clearly erroneous when there is no evidence supporting the findings or the findings fail to support the judgment. *Id.* A judgment is also clearly erroneous when the trial court applies the wrong legal standard to properly found facts. *Id.*

### II. Analysis

#### A. De Facto Custodian Status

In its findings and conclusions, the trial court determined that Caretakers had exercised liberal visitation but were not de facto custodians of T.P. pursuant to Indiana Code section 31–9–2–35.5 (2008). A person is a "de facto custodian" if he has been the primary caregiver for, and finan-

---

sideration of this evidence is not necessary for the disposition of the instant appeal. Accordingly, we deny as moot, in companion orders, Appellants' November 20, 2009 Motion to Strike and December 14, 2009 Motion for Leave to Reply to Appellee's Response.

7. Caretakers point out that the trial court issued its findings and conclusions sua sponte, in which case such findings and con-

clusions control the issues they cover only. While, as Caretakers point out, a general judgment standard applies to all other parts of a final order, here the findings and conclusions directly covered Caretakers' status as de facto custodian and the proper custody of T.P. Accordingly, we apply the two-tiered standard of review for findings and conclusions.

cial support of, a child who has resided with the person for a period of at least one year if the child is at least three years old.[8] *See* Ind.Code § 31–9–2–35.5. Caretakers challenge this finding by arguing that the financial and other resources they provided for T.P. for a "significant majority of the time" established that they were de facto custodians. Appellant's Br. p. 6.

As Mother points out, the time period of May 2007 to September 2008, during which Caretakers claim they cared for T.P. for a "significant majority of the time" is approximately 498 days. Even if, as Caretakers claim, they cared for T.P. for 244 days during this period, this was not a majority, much less a significant majority, of the time. Further, while there was evidence that Caretakers provided basic needs and financial support for T.P., Caretakers point to no evidence demonstrating that this constituted a majority of T.P.'s total needs and support. *Cf. A.J.L. v. D.A.L.*, 912 N.E.2d 866, 870 (Ind.Ct.App. 2009) (evidence that aunt and uncle provided food, shelter, daily care, and educational assistance and, with the help of other family members, provided for the medical care and clothing of mother's children supported the determination that aunt and uncle were de facto custodians). Caretakers fail to demonstrate clear error in the trial court's conclusion that they were not T.P.'s primary caregivers and de facto custodians.

Further, as Mother contends and Caretakers concede, even if they qualified as de facto custodians, they were still required to overcome the natural parent presumption in order to gain custody of T.P. The trial court awarded custody to Mother based upon this presumption. Accordingly, we consider whether the trial court committed clear error in concluding that Caretakers failed to overcome this presumption.

**B. Natural Parent Presumption**

■ Before placing a child in the custody of a person other than the natural parent, a trial court must be satisfied by clear and convincing evidence that the best interests of the child require such a placement. *In re Guardianship of B.H.*, 770 N.E.2d 283, 287 (Ind.2002). The trial court must be convinced that placement with a person other than the natural parent represents a substantial and significant advantage to the child. *Id.* The presumption will not be overcome merely because "a third party could provide the better things in life for the child." *Id.* (internal quotation omitted). In a proceeding to determine whether to place a child with a person other than the natural parent, the court may consider the natural parent's (1) unfitness, (2) long acquiescence in the third party's custody of the child, or (3) voluntary relinquishment of the child such that such that the affections of the child and third party have become so interwoven that to sever them would seriously mar and endanger the future happiness of the child. *See K.I.*, 903 N.E.2d at 458–59 (citing *Hendrickson v. Binkley*, 161 Ind.App. 388, 394, 316 N.E.2d 376, 380 (1974)) (endorsing above factors but concluding they are non-exclusive for purposes of overcoming natural-parent presumption). The trial court is not, however, limited to these criteria. *See id.* At issue is whether the important and strong presumption that a

---

8. Section 31–9–2–35.5 also provides that any period after a child custody proceeding has been commenced may not be included in determining whether the child has resided with the person for the required period. In addition, "de facto custodian" does not include a person providing care for a child in a foster family home. *See id.* Given our resolution of this issue, we find it unnecessary to address these additional considerations regarding "de facto custodian" status.

child's interests are best served by placement with the natural parent is clearly and convincingly overcome by evidence proving that the child's best interests are substantially and significantly served by placement with another person. *B.H.,* 770 N.E.2d at 287. This determination falls within the sound discretion of our trial courts, and their judgments must be afforded deferential review. *Id.*

### 1. Acquiescence and Strong Emotional Bond

The trial court concluded that Mother had permitted liberal visitation by Caretakers but had not acquiesced in their having custody of T.P., and that the only strong emotional bond so interwoven that severing it would seriously endanger T.P.'s happiness was between T.P. and Mother. Apart from highlighting the evidence demonstrating Caretakers' frequent care of and strong bond with T.P., Caretakers point to no evidence suggesting that the trial court's findings constitute clear error. The fact that T.P. and Caretakers have spent a great deal of time together and have a strong bond does not negate the finding that Mother and T.P. have similarly spent a great deal of time together and maintain a stronger bond. We find no clear error based upon these two factors.

### 2. Unfitness

#### a. Allegedly Improper Influences

The trial court concluded that Mother was not unfit. In challenging the trial court's judgment on this basis, Caretakers claim Mother has a history of exposing T.P. to improper influences. In denying Caretakers' petition, the trial court acknowledged evidence indicating that Mother lived in an "unsafe community with crime," and that Mother had used drugs in the past, including as recently as the summer of 2008. Appellant's App. p. 52. In declining to use these facts as grounds for granting the Caretakers' petition, the trial court concluded that T.P. appeared to have adjusted to her community, that no community was exempt from crime, and that Mother had subsequently refrained from drug use.

Caretakers claim contrary to the trial court's conclusions that Mother has a dangerous lifestyle which places T.P. at risk and should overcome any custodial presumption in Mother's favor. In highlighting the risky nature of Mother's lifestyle, caretakers point to allegations in the record that Mother exposed T.P. to drug use and sexual activity, and that D.B. was stabbed blocks from Mother's house. Caretakers claim that the effects of these dangerous influences are manifested in T.P.'s poor school performance.

As a preliminary matter, the trial court's evaluation of the evidence attributed T.P.'s difficulties in school to her possible learning disability and the late start to her school year rather than to the alleged dangerous influences at her home. We will not reweigh the trial court's conclusions on that point. With respect to Mother's drug use, Caretakers point to no evidence that Mother engaged in drug use following the summer of 2008. The trial court was aware of Mother's past drug use but focused its evaluation of the current custody arrangement on Mother's present behavior, which showed no ongoing drug use following the summer 2008 relapse. Given the facts demonstrating Mother's promising efforts to overcome past drug problems, which the trial court found persuasive, we find no clear error in the court's upholding the custodial presumption in Mother's favor in spite of her past drug use.

To the extent Caretakers allege that Mother's drug use and certain sexual activity occurred in front of T.P., the trial

court credited T.P.'s denial that this had occurred, and we will not reweigh that evidence. In addition, certain past sexual allegations were apparently deemed unsubstantiated by Child Protective Services, and, as the trial court found, medical evaluations did not raise concerns regarding Mother's care of T.P. We find no clear error on this point.

As for the evidence that crimes occur in Mother's neighborhood,[9] the trial court specifically found that T.P. had adjusted to her community in spite of this fact. The record further shows that Mother had taken steps to ensure T.P.'s safety, including walking T.P. to and from school. Given Mother's efforts to address the crime in her neighborhood and the trial court's conclusion that T.P. had adjusted to her community, we similarly find no clear error in the trial court's declining to use this factor to overcome Mother's custody presumption.

### b. Adequacy of Housing

The trial court also concluded that Mother's history of unstable housing was largely justified and that her housing situation as of March 2009 was fully adequate for Mother to maintain custody of T.P. In challenging the trial court's determination on this point, Caretakers point to the number[10] and alleged inadequacy of Mother's housing arrangements. According to Caretakers, the record is replete with examples of Mother's homes lacking certain utilities, including heat and water, as well as beds and other necessities.

The record contains conflicting evidence regarding the adequacy of Mother's past residences. Caretakers contended that six out of nine of these homes lacked utilities or beds, had holes in the walls and/or ceilings, or contained rodents or roaches. Mother testified, in contrast, that all of her homes had heat, working appliances, and—with the exception of one month-long residence—running water, and that T.P. was never required to sleep on the floor. The trial court was entitled to credit Mother's version of her housing situation, or perhaps parts of it, over the Caretakers'. We will not reweigh that evidence.

Further, rather than focusing upon the specifics of the alleged past housing problems,[11] the trial court was more focused upon the currently improved state of Mother's housing situation and the fact that her frequent moves demonstrated her initiative to address problems.[12] By the time of the February 12 hearing, Mother's housing conditions, according to Polleys's report, were adequate and included running water, electricity, and other housing

9. To the extent Caretakers base this claim upon acts of domestic violence between Mother and D.B., the trial court concluded that certain acts of alleged violence between Mother and D.B. from 2004 did not demonstrate a pattern of violence for purposes of the 2009 hearings. As for the 2008 incident between Mother and her brother, the trial court concluded that this single incident did not establish a pattern of present violence with a determinable effect upon T.P. Aside from speculating that this caused T.P.'s schoolwork to suffer, Caretakers point to no evidence in the record demonstrating that these incidents occurred in T.P.'s presence and had a detri-

mental effect upon her. This claim yields no relief.

10. Mother has had ten residences since May 2007.

11. Significantly, the trial court further concluded that there was no evidence Mother's moves were due to her inability to pay rent or in response to eviction proceedings.

12. The trial court additionally found credible Mother's and D.B.'s claims that their moves were partially attributable to harassment by Caretakers.

necessities. While the pipes in that residence apparently later burst,[13] Mother found new housing, which, as Polleys and the trial court observed, was also fully adequate. Given Mother's currently improved, and by all accounts, adequate housing conditions and the trial court's reasonable conclusion that Mother's frequent moves demonstrated her ability to address and resolve problems, Caretakers' challenge to T.P.'s custody and Mother's custodial presumption based upon Mother's past moves and housing problems does not demonstrate clear error.

### 3. Statutory Factors

We have already concluded that Caretakers' allegations of dangerous influences and inadequate housing do not demonstrate clear error by the trial court in denying, based upon the natural parent presumption, their petition for modification of custody. In challenging the trial court's judgment, Caretakers also list the statutory factors relevant to determining the best interests of the child in custody determinations. To the extent these factors allegedly operate to overcome the natural parent presumption, we consider Caretakers' arguments. In considering these factors, we remain mindful that a party's ability merely to provide the better things in life for a child does not overcome the presumption. *See B.H.*, 770 N.E.2d at 287.

Indiana Code section 31–14–13–2 (2008) lists the following factors relevant to determining the best interests of the child in custody determinations:

(1) The age and sex of the child.

(2) The wishes of the child's parents.

(3) The wishes of the child, with more consideration given to the child's wishes if the child is at least fourteen (14) years of age.

(4) The interaction and interrelationship of the child with:

(A) the child's parents;

(B) the child's siblings; and

(C) any other person who may significantly affect the child's best interest.

(5) The child's adjustment to home, school, and community.

(6) The mental and physical health of all individuals involved.

(7) Evidence of a pattern of domestic or family violence by either parent.

(8) Evidence that the child has been cared for by a de facto custodian, and if the evidence is sufficient, the court shall consider the factors described in section 2.5(b) of this chapter.

Factor (1) above seems fairly irrelevant to the natural parent presumption at issue. Factors (2) and (3) do not help to overcome this presumption. Mother wishes to maintain custody of T.P. Further, as the trial court found and Caretakers do not dispute, T.P. expressed no preference for the Caretakers and indicated that she loved Mother and liked living with her. None of these factors demonstrates clear error.

Factor (4) similarly does not serve to overcome the presumption. The trial court found that T.P. had positive interactions with both Mother and D.B., as well

---

**13.** Caretakers apparently argue that Mother misrepresented the location of her residence as 1758 Howard during the February 12 hearings. Caretakers point to testimony by D.B. that he and Mother had moved prior to that date to a house across the street because the pipes at 1758 Howard had burst. D.B.'s testimony contains multiple conflicting dates. The trial court was entitled to credit Mother's testimony that the move from 1758 Howard due to burst pipes had occurred after the February 12 hearings.

as with the Caretakers and their children. Caretakers' contention that T.P.'s interactions with Mother and D.B. are not positive are based largely upon Mother's and D.B.'s alleged interactions with each other, not with T.P.[14] In addition, there was ample evidence to support the trial court's conclusion that Mother and T.P. have positive interactions. While at Mother's house, T.P.'s activities include doing homework, eating snacks, playing with her dogs and a cat, riding her bicycle, and watching television, all of which are reasonably productive and suitable activities. Caretakers demonstrate no clear error on this point.

With respect to Factor (5), the trial court found that T.P. was adjusted to her home and community. Caretakers challenge this factor by repeating certain facts regarding Mother's past, which we have already determined do not overcome the presumption. With respect to T.P.'s school performance, the trial court acknowledged T.P.'s struggle with school and noted that T.P.'s after-school tutoring, which the evidence suggested was available at the Caretakers' school, currently lacked funding at Mother's school. Nevertheless, the trial court was unpersuaded that T.P.'s school problems warranted a change in custody. T.P. had good attendance at school once she became enrolled,[15]

she received tutoring during the day, she was seeing a behavioral counsel at Mother's request, and T.P.'s teachers were not concerned about Mother's care for T.P. While Caretakers claim that T.P. was "flunking out" while participating in the same or similar programs the year before, the trial court was within its discretion to conclude that repeat exposure to these programs had the potential to address T.P.'s educational needs.[16] Of course other educational opportunities in other locations may perhaps be superior, but we find no clear error in the trial court's concluding that certain missed or reduced educational opportunities did not overcome Mother's custodial presumption.

Regarding Factor (6), which addresses physical and mental health, the trial court concluded that both Mother and Caretakers had good mental and physical health. Caretakers' challenge to this finding is purely speculative and based upon Mother's past behavior. We find no clear error.

Regarding Factor (7), which addresses domestic or family violence, the trial court concluded that certain acts of alleged violence between Mother and D.B. from 2004 did not demonstrate a pattern of violence for purposes of the 2009 hearings. As for the August 2008 incident between Mother and her brother, the trial court concluded

14. The Caretakers' claim is partly based upon D.B.'s method of disciplining T.P. by "pound[ing] her little butt." Tr. Vol.2p. 81. While this is arguably troublesome, we cannot say that this corporal punishment, claimed to be infrequent, renders erroneous the trial court's conclusion that T.P.'s interaction with D.B., whom she calls "Dad," is "good." Appellant's App. p. 50. In any event, it does not overcome Mother's custodial presumption.

15. To the extent Caretakers claim that T.P. had poor school attendance, the trial court concluded that this attendance was good once she was enrolled. It was reasonable for the

trial court to factor T.P.'s late arrival to the school when considering her attendance. Caretakers are simply asking that we reweigh the evidence on this point, which we decline to do.

16. Caretakers further contend that the trial court's finding that T.P.'s teachers were not concerned about Mother's care was necessarily refuted by the evidence and logic. Caretakers point to no evidence refuting this conclusion, and we are not inclined to find a direct and necessary link between school performance and parental care.

that this single incident did not establish a pattern of present violence with a determinable effect upon T.P. Caretakers point to no evidence in the record demonstrating the occurrence of additional violent incidents in the recent past, and aside from pure speculation, fail to demonstrate that the August 2008 incident occurred in T.P.'s presence and had a detrimental effect upon her. (Exh. 1, pp. 13–14) We find no clear error in the trial court's failure to construe this factor so as to overcome Mother's custodial presumption.

Factor (8) relates to care by a de facto custodian. We have already found no clear error in the trial court's conclusion that Caretakers were not de facto custodians. This factor warrants no relief.

### III.  Conclusion

Having concluded that Caretakers have failed to demonstrate that the trial court's denial of their petition for modification of custody, based upon the natural parent presumption, constituted clear error, we reject their challenge to the trial court's judgment.

The judgment of the trial court is affirmed.

NAJAM, J., and FRIEDLANDER, J., concur.